# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

HARBERT MANAGEMENT CORPORATION,
HMC-NEW YORK, INC. and HMC INVESTORS, LLC,

Defendants.

12 CIV 5029

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint

against Defendants Harbert Management Corporation, HMC-New York, Inc., and HMC Investors,

LLC, alleges:

## SUMMARY

1.   This case stems from an illegal "short squeeze"—a form of market manipulation

that occurs when a trader constricts the available supply of a security with the intention of forcing

settlement from short sellers at the trader's arbitrary and inflated prices.  Between April 2006 and

January 2007, Philip A. Falcone, through two investment managers he controls, acquired more than

the outstanding issue of distressed, high-yield bonds issued by MAAX Holdings, Inc. ("MAAX")

and locked up the position in a bank.  Thereafter, he forced certain short-sellers to cover their

positions at inflated prices.  During the entire period, Defendants Harbert Management Corporation

("Harbert"), HMC-New York Inc. ("HMC-NY") and HMC Investors, LLC ("HMC Investors")

(collectively the "Defendants"), directly or indirectly, possessed the power to control Falcone and

the investment managers through which he operated.  Defendants and their affiliates also provided

hedge fund administration, legal, compliance, risk assessment and other services to the funds.  In

these capacities, Defendants knew of the funds' trades in the MAAX bonds, but failed to take

appropriate steps to address the manipulative conduct.

2.      Between April and June 2006, Falcone, through the investment managers,

purchased 108 million of MAAX's junior discount bonds (the "MAAX zips"), which constituted

about 63% of the issue, for Harbinger Capital Partners Master Fund I ("Master Fund").  During the

summer of 2006, Falcone heard rumors that a Wall Street financial services firm that provided

prime brokerage services to the Master Fund ("the Wall Street firm") was shorting the bonds and

encouraging its customers to do the same.  Falcone retaliated.

3.      In September and October 2006, Falcone, through the investment managers,

purchased all of the remaining outstanding MAAX zips in the open market for the Master Fund and

the newly created Harbinger Capital Partners Special Situations Fund ("Special Situations Fund").

(The funds are collectively referred to hereinafter as the "Harbinger funds.")  By October 24, 2006,

the Harbinger funds had purchased more than the available supply of bonds—their aggregate

position stood at a 174 million notes face value in a 170 million note issue.

4.      Contemporaneously with these purchases, Falcone and the investment managers

arranged, through the Defendants, to transfer the MAAX zips that the Harbinger funds held in their

prime brokerage accounts to a custodial account in a bank in Georgia so that none of the bonds

could be lent out or used to cover short positions.  Falcone and the investment managers then

demanded that the Wall Street firm settle its outstanding MAAX transactions and deliver the

securities it owed.  Falcone and the investment managers did not disclose that it would be virtually

impossible for the firm to acquire any bonds to deliver, as nearly the entire supply was locked up in

the funds' custodial account and were not for sale.

2

5.      Even though they had already purchased more than the available supply of bonds, Falcone and the investment managers continued to enter into trades on behalf of the Harbinger funds to purchase the MAAX zips from apparent short sellers—taking the long side of short sales in the open market.  By late January 2007, the Harbinger funds had acquired another 18 million MAAX notes, increasing their holdings to 113% of the issue.  At this point, the Harbinger funds had purchased 22 million more bonds than had ever been issued.  Due in large part to Falcone and the investment managers' control of the supply and their continued demands for delivery, the bonds more than doubled in price.

6.      On July 31, 2007, Falcone and the investment managers sold a block of the MAAX zips in the open market, effecting settlement from a short seller at an inflated price of 95.  The same day, Falcone's investment managers directed Defendants to mark down the price of the bonds from 55 so that they were carried on the funds' books at a price of 40.

7.      In the fall of 2007, Falcone and the investment managers informed the Wall Street firm, which had been trying to locate and purchase MAAX zips to satisfy its delivery obligations on unsettled short sale transactions, that the Harbinger funds had acquired more than the entire issue.  A short time later, the Wall Street firm informed Falcone that it could not bid for the bonds while the Harbinger funds were over the issue size.

8.      On December 24, 2007, the Harbinger funds, operating through Falcone and the investment managers, sold 25 million face amount MAAX zips for $0.01 per $100 face amount (for a total of $2,500) through an inter-dealer broker to an off-shore account at a large brokerage house.  At the end of the month, Falcone directed Defendants to write off the MAAX position as worthless.  Falcone, however, continued to press the Wall Street firm to deliver the securities it owed.

9.      In the first week of January 2008, Falcone and the investment managers informed

the Wall Street firm that the Harbinger funds had sold some of the MAAX notes and that their

collective ownership position was below the total issue size. Falcone stated that he expected the

Wall Street firm to deliver the notes due immediately. On January 11, 2008, in order to cover

outstanding short positions, the Wall Street firm and two other traders purchased over 2 million

MAAX zips in the $60 range from Harbinger.

10.     Based on the conduct described above, Falcone and the investment managers

through which he operated manipulated the market in the MAAX zips in violation of Section 10(b)

of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5]. Defendants controlled Falcone and the investment managers,

within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], yet failed to take

adequate steps to address their manipulative conduct. Defendants are, therefore, jointly and

severally liable for the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

11.     The Commission brings this action pursuant to the authority conferred upon it by

Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], seeking to permanently restrain and

enjoin Defendants from engaging in the acts, practices and courses of business alleged herein.

12.     In addition to the relief recited above, the Commission seeks a final judgment

ordering Defendants to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15

U.S.C. § 78u(d)(3)] and such other relief as the Court deems just and appropriate.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction under Sections 21(d), 21(e), and 27 of the Exchange Act

[15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Defendants HMC, HMC-NY and HMC Investors, directly

or indirectly, made use of the means or instrumentalities of interstate commerce, including

electronic mail, of the mails, or of the facilities of a national securities exchange in connection with

the transactions, acts, practices, and courses of business alleged in this Complaint.

14.     Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] or 28 U.S.C. § 1391(d) because, among other reasons, certain acts or transactions constituting the violations by Defendants occurred in this district.

## DEFENDANTS

15.     **Harbert Management Corporation** ("Harbert") is an investment management company incorporated in the State of Alabama and headquartered in Birmingham. Among its other business activities, Harbert sponsors, markets and administers hedge funds in diverse markets. In 2001 Harbert created the Master Fund, provided it with $25 million of seed capital, and hired Falcone to manage its investments. In 2006 it created the Special Situations Fund and again hired Falcone to manage its investments. As described in more detail below, Harbert possessed corporate control over the investment managers through which Falcone operated. On March 4, 2009, Harbert terminated its relationship with Falcone. Falcone continues to manage the Harbinger funds.

16.     **HMC Investors, LLC** ("HMC Investors") is a limited liability company formed under the laws of Delaware. At all relevant times, HMC Investors was the managing member of the investment manager of the Master Fund and thus had the power to control Falcone and the investment manager. HMC also served as a pass-through vehicle for the distribution of certain profits from both Harbinger funds. Falcone was the senior managing director of the investment manager and exercised authority over the investment decisions for the funds and other investment-related activities, including those described herein. At all relevant times, the members of HMC Investors included Falcone and the executive officers of Harbert. Harbert is the sole managing member of HMC Investors.

17.     **HMC-New York, Inc.** ("HMC-NY") is a Delaware corporation headquartered in

New York, New York.  At all relevant times, HMC-NY was the managing member of the general partner for the Special Situations Fund and thus had the power to control Falcone and the investment manager.  HMC-NY was Falcone's employer.  As with HMC Investors, Falcone was the senior managing director of the investment manager and exercised authority over the investment decisions for the funds and other investment-related activities, including those described herein.  HMC-New York is wholly owned by Harbert.

### OTHER RELEVANT ENTITIES

18.    **Philip A. Falcone**, age 49, is a co-founder, with defendant Harbert, of the Harbinger Master Fund and Harbinger Special Situations Fund.  At all relevant times, Falcone was the senior managing director of the investment managers, and he exercised authority over and directed their activities.  In March 2009, Falcone purchased Harbert's interest in the investment managers of the funds and changed the name of his investment management group to Harbinger Capital Partners LLC.  Falcone is a resident of New York, New York.

19.    **Harbinger Capital Partners Master Fund I** ("Master Fund") is a hedge fund that was founded in 2001 by Harbert and Falcone.  The Master Fund's initial assets consisted of $25 million of seed capital provided by Harbert.

20.    **Harbinger Capital Partners Special Situations Fund** ("Special Situations Fund") is a hedge fund formed by Falcone and Harbert in 2006.  In mid-2008 the combined assets of the Master Fund and the Special Situations Fund totaled approximately $26 billion.

21.    **MAAX Holdings, Inc.** ("MAAX") is a Delaware corporation headquartered outside of Minneapolis, Minnesota, which, through its subsidiaries, manufactures and distributes mid- to high-end bathroom fixtures and spas.  In its heyday in the late 1990's and early 2000's, MAAX (then doing business as MAAX, Inc.) was the leading manufacturer and distributor of bathtubs and showers in Canada and the third largest in the United States.  In 2004, MAAX issued

two series of bonds: (1) $150 million of 9.75% senior subordinated notes due 2012, which were secured against the assets of the operating company, MAAX Corporation ("MAAX senior notes"), and (2) $170.7 million principal amount at maturity of 11.25% senior discount notes due 2012 ("MAAX junior notes" or "MAAX zips"), which were secured against the asset-less holding company. (It was the market in this latter series of bonds that the Commission alleges was manipulated.) Both the MAAX senior and junior notes traded over-the-counter. In July 2008, the company filed for Chapter 15 bankruptcy protection in the U.S. Bankruptcy Court in Delaware. MAAX remains in business, but its earnings are a small fraction of those it made in the past.

## FACTUAL ALLEGATIONS

A.   *Control of the Investment Managers to the Funds*

22.   During the relevant time period, Defendants Harbert, HMC-NY and HMC Investors possessed the power to control Falcone and the investment managers to the Harbinger funds. The Master Fund is a Cayman Island corporation with regard to which Harbinger Capital Partners Offshore Manager, L.L.C. ("Offshore Manager") was the investment manager. The Special Situations Fund is a Delaware limited partnership with regard to which Harbinger Capital Partners Special Situations GP, LLC ("Special Situation GP") was the investment manager. Falcone was the senior managing director of Offshore Manager and Special Situation GP. Falcone in essence functioned as the funds' investment manager and exercised authority over the investment decisions for the funds and other investment-related activities described herein. HMC-NY and HMC Investors had the authority to, among other things, enter into business contracts in the funds' names, force the withdrawal of limited partners, fire Falcone and the investment managers, and even dissolve the funds. Accordingly, Harbert, HMC-NY and HMC investors had the power to control Falcone and the investment managers.

23.   During the relevant time period, Defendants Harbert, HMC-NY and HMC Investors

7

also exercised control over the back office functions of the funds, such as monitoring and settling all trades, setting up brokerage accounts, and arranging for payment of securities.. The Defendants also provided the funds with administrative, accounting, tax, investor relations, marketing, risk management, compliance and legal services in exchange for an advisory fee. Defendants performed these services from their offices in Birmingham, Alabama.

24.     The Defendants rendered the above-described services to the Harbinger funds for all of the transactions in the MAAX notes.

B.     *Falcone and the Investment Managers Accumulate 100% of the Bonds.*

25.     Between April 11 and June 6, 2006, Falcone and the investment managers acquired 108 million of the MAAX zips, or about 63% of the issue, for the Master Fund. The total cost of this position was about $54.5 million (or $50.50 per note). During this period, the fund's purchases of the MAAX zips represented about 40% of the total trades and accounted for 63% of the trading volume.

26.     Sometime during the summer of 2006, Falcone and his investment managers began hearing rumors that the Wall Street firm and its customers were aggressively short selling the MAAX zips.

27.     Falcone was angered by this. He speculated that the Wall Street firm was putting its proprietary trading interest ahead of his own—that it was undercutting the value of his MAAX position and possibly borrowing his own notes to cover its short position.

28.     Falcone decided to retaliate. Falcone and the investment managers decided to buy up all of the available MAAX zips, restrict their supply in the market, and then pressure the short sellers to cover their short positions at artificially inflated prices.

29.     Between September 6 and October 24, 2006, Falcone and the investment managers' direction, purchased an additional 69.5 million MAAX zips at a total cost of approximately $25

million. These trades accounted for 69% of the total trades and 84.9% of the share volume during this period.

30.     By October 24, 2006, Falcone and the investment managers had purchased more than the entire issue of the MAAX zips—the funds' position now stood at 174 million face value in a 170 million bond issue.

31.     Defendants discussed this position at a periodic hedge fund meeting attended by several of their senior officers.  None of the funds sponsored by Harbert had ever acquired such a position, and the legality of it was researched and discussed by Harbert's legal and compliance personnel.  Hedge fund administration personnel began tracking Harbinger's MAAX transactions on a daily basis.

C.     *Harbinger Locks Up the Bonds.*

32.     In October 2006 Falcone and the investment managers directed the transfer of the MAAX bonds held in the Harbinger funds' prime brokerage accounts to a custodial bank account, which would make the bonds unavailable to be loaned to short sellers trying to cover their positions.

33.     Between October 17 and November 1, 2006, the MAAX bonds held in the Harbinger funds' prime brokerage accounts were transferred to a Harbinger custodial account at a bank in Georgia.

34.     Falcone and the investment managers then demanded that the Wall Street firm go into the open market and "buy-in" its customers who had failed to deliver bonds at settlement, pursuant to the rules of the Financial Industry Regulatory Authority ("FINRA").  Falcone and the investment managers, on behalf of the Harbinger funds, had executed buy orders and paid for the MAAX bonds in these transactions, but the sellers of the bonds had failed to deliver them at settlement.  Falcone and the investment managers knew that it would be difficult for the Wall

9

Street firm to find any bonds on the open market, as most of them had been locked up in the

Georgia bank. At this time, the Wall Street firm owed the Harbinger funds approximately 21.5

million face amount of MAAX zips from unsettled trades.

D.    *Falcone and the Investment Managers Purchase 113% of the Issue.*

35.    Even after acquiring the entire issue, Falcone and the investment managers

continued to direct and cause the Harbinger funds to acquire MAAX zips in order to continue to

manipulate the market in the bonds.

36.    Between October 25, 2006, and January 26, 2007, the Harbinger funds, at Falcone's

and the investment managers' direction, purchased a little over 17 million of the notes at a total

cost of $9.8 million. The Harbinger funds were involved in 55.3% of the transactions in MAAX

during this period, and the funds' purchases accounted for 71.8% of the volume.

37.    This continued accumulation, in conjunction with the lock-up of the funds' entire

positions at the Georgia bank and the resulting constriction of supply, caused the price of the bonds

to skyrocket. By November 9, the notes, which had been trading between 36-1/2 and 41 during the

fall, jumped to 52-1/2. By the end of November 2006, the MAAX zips were selling at 75-1/4.

Falcone and the investment managers continued to acquire the zips through January 2007 at prices

as high as 86, which represented more than the accreted value of the bond.

38.    Falcone and the investment managers continued to demand that the Wall Street firm

buy in the outstanding short positions in the MAAX zips and deliver the securities. The firm,

however, was unable to locate any bonds that could be delivered.

39.    On January 16, 2007, the MAAX zips began trading at prices that were higher than

the more senior MAAX notes. Historically, the senior notes, which were backed by the assets of

the operating company, traded 300 basis points (or 3%) in yield ahead of the zips, which were

backed by the asset-less holding company. This market was now upside-down.

40.     Falcone recognized that the funds' accumulation of the notes had inflated their market value, and he and his investment managers directed that the funds' positions be marked down on their books at the end of January to 55—a 36% discount to market.

41.     On January 31, 2007, the Harbinger funds' position in the MAAX notes reached its high water mark—192,609,000 bonds, or 113% of the issue—a position almost 22 million bonds greater than what MAAX had issued.  Falcone and the investment managers acquired these bonds at a total purchase price of $90.7 million.  Falcone and the investment managers directed the purchase of the entire position.

E.      *The Squeeze Continues.*

42.     During the winter and spring of 2007, Falcone directed his traders to continue to press the Wall Street firm for delivery of the MAAX zips it had failed to deliver at settlement.

43.     The Wall Street firm's proprietary trading desk bid on the MAAX zips up to three times per day, but was unable to find any bonds to cover the outstanding short positions.

44.     Sometime in the spring of 2007, Harbinger, at Falcone and the investment managers' direction, paid off the debt in its margin account and demanded that the Wall Street firm return any securities it had borrowed, including MAAX zips.

45.     On May 23, 2007, one of the salesmen on the Wall Street firm's proprietary trading desk contacted a trader for the Harbinger funds and inquired whether they had any MAAX zips to sell.  Falcone directed the trader to respond that the funds would sell the firm MAAX zips "guaranteed delivery at 100."   The Wall Street firm believed that the price was too high and declined the offer.   Again, no one informed the Wall Street firm that the funds had acquired more than the entire issue of the zips, that they had locked up nearly the entire issue in a bank in Georgia, and that the funds were, for all practical purposes, the only source of the notes.

46.     On July 31, 2007, an arbitrage fund located in New York City purchased 700,000

MAAX zips at 95 from Harbinger to cover an outstanding short position. This was the highest price ever paid for the MAAX zips.

47.     On the morning of the trade, an analyst working for Falcone directed that the funds' position in the MAAX zips be marked down from 55 to 40 on the funds' books due to the current market in the senior debt and the deteriorating state of the company's finances.

48.     In late September 2007 the Wall Street firm called Falcone to discuss the situation with the MAAX bonds and its possible resolution. In the course of this conversation, Falcone informed the firm that the Harbinger funds had purchased more than the entire issue of the MAAX zips.

49.     In early to mid-October 2007, the Wall Street firm called Falcone back and informed him that the firm would not bid for the MAAX zips while the Harbinger funds controlled the entire issue.

F.     *The Christmas Eve Transaction*

50.     On December 24, 2007, the Harbinger funds, acting at Falcone's and the investment managers' direction, sold 25 million MAAX zips at $0.01 per $100 face amount (for a total of $2,500) from one of their prime brokerage accounts to a retail account at a different firm. Falcone and the investment managers ordered this trade because they wanted to reduce the position below the issue size—one of the conditions the Wall Street firm had set for buying in its customer and proprietary short positions.

51.     Initially, the 25 million note transaction was structured as a sale between two Harbinger fund accounts at different brokerage firms. This initial sale was cancelled sometime on December 24. The trade was then re-executed as a sale by Harbinger to an account of a Cayman Islands corporation at a different firm.

52.     The trade of the 25 million MAAX zips described above was made through the head of a high yield trading desk at an inter-dealer broker (the "Inter-Dealer Broker") with whom Falcone and the investment managers had a longstanding relationship. The head of the Inter-Dealer Broker's high yield trading desk executed the trade, using the discretionary authority he had over the Cayman Islands customer's account. The customer himself was unaware of the trade until many months later.

53.     None of the brokers involved reported the sale of the 25 million notes at a penny on FINRA's Trade Reporting and Compliance Engine, or TRACE, system, as required by FINRA rule. As a result, the market was not informed that a substantial block of MAAX zips had been sold, and even those who later learned of the transaction did not know the volume or price of the notes sold or the identity of the brokers involved.

54.     The sale of the 25 million bond block at a penny drew immediate scrutiny at one of the brokerage firms and Harbert. Late in the morning on December 24, the brokerage firm's back office questioned the pricing of the transaction. In an email to a sales representative working under Falcone, the back office questioned how the bond could be sold at a penny, when the firm was carrying it at $78 on its books. The firm's sales representative forwarded the email to a fund accountant at Harbert, asking for assistance.

55.     Over the next several days, several of Defendants' senior officers and others at Harbert became aware of the 25 million share transaction at a penny. One person even speculated that Falcone was trying to put some supply into a short-squeezed market.

56.     Prior to year-end, Falcone and the investment managers directed that the funds' positions in the MAAX zips be marked down to correspond to the $.01 sale price.

G.    *The 2008 Transactions*

57.    On January 4, 2008, Falcone sent an email to the Wall Street firm stating that he wanted the MAAX buy-in completed. In the email, he informed the firm that he and the investment managers had sold a block of MAAX zips and that the Harbinger funds no longer owned the entire issue, thus removing a principal obstacle to the firm's continued bidding in the market.

58.    In an effort to locate the owner of the bonds, the Wall Street firm asked Falcone for the details of the trade. Falcone refused to provide any.

59.    Soon thereafter, the Wall Street firm began bidding again in the open market for the MAAX bonds, but it was unable to acquire any.

60.    On January 11, 2008, two transactions in the MAAX zips were reported on TRACE: the first involving the sale of one million MAAX zips at 60-1/2, and the second, 150,000 zips at 60-1/16. Although unknown to the market, the Harbinger funds, through Falcone and the investment managers, were the sellers in both transactions, and the buyers were hedge funds covering short positions.

61.    The Wall Street firm saw the transactions in the MAAX zips on TRACE and subsequently purchased one million zips at or about 60.

62.    Defendants, who only weeks earlier had written off Harbinger's MAAX position as worthless, knew of these transactions and did not question them.

63.    Harbinger and the Wall Street firm ultimately resolved their differences over the MAAX zips.

## CLAIM FOR RELIEF

### Control Person Liability under Section 20(a) of the Exchange Act

64.    The Commission realleges and incorporates paragraphs 1 through 63 as if fully set forth herein.

65.    By reason of the conduct described above, Falcone, Offshore Manager and Special Situations GP, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon other persons in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

66.    At all relevant times, Defendants Harbert, HMC-NY and HMC Investors possessed, directly or indirectly, the power to direct and control Falcone and the investment managers through which he operated, including the power to direct and control the investment managers' management and policies and to fire Falcone and his team. Defendants were, therefore, controlling persons of Falcone and the investment managers pursuant to Section 20(a) of the Exchange Act.

67.    Defendants Harbert, HMC-NY and HMC Investors were culpable participants in the fraudulent conduct described above and alleged herein.

68.    By reason of their actions alleged herein, Defendants Harbert, HMC-NY and HMC Investors are jointly and severally liable as controlling persons pursuant to Section 20(a) of the Exchange Act for Falcone's and the Harbinger funds' investment managers' violations of

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and unless enjoined and restrained will again violate these provisions and rules.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining and restraining Defendants Harbert, HMC-NY and HMC Investors from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rules 10b-5 thereunder.

### II.

Ordering Defendants Harbert, HMC-NY and HMC Investors to pay a civil money penalty in the amount of $1 million pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### III.

Granting such other and further relief as this Court deems just and appropriate.

Dated:    June 27, 2012
          New York, New York

                    SECURITIES AND EXCHANGE COMMISSION

By: _____
David P. Stoelting
Senior Trial Counsel
New York Regional Office
3 World Financial Center, Room 400
New York, NY 10281
Telephone: (212) 336-0174
E-mail: stoeltingd@sec.gov

Of Counsel:

David J. Gottesman
Conway T. Dodge, Jr.
Robert C. Besse
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington DC 20549-5985